UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHERYLANN GELHAUSEN, | ) | 1:13CV2311 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | MAG. JUDGE KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMIN., | ) | |
| | ) | |
| | ) | |
| Defendant | ) | MEMORANDUM |
| | ) | AND ORDER |

McHARGH, MAG. JUDGE

The issue before the court is whether the final decision of the Commissioner of Social Security ("the Commissioner") denying Plaintiff Cheryl A. Gelhausen's application for Social Security Disability and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C § 1381 et seq., is supported by substantial evidence and, therefore, conclusive.

I. PROCEDURAL HISTORY

On August 13, 2010, Plaintiff Cheryl A. Gelhausen ("Gelhausen") applied for Disability Insurance benefits. (Doc. 14, tr., at 14, 168-169.) Gelhausen stated that he became unable to work because of her disabling condition on April 10, 2008. (Tr., at 14, 168.) Gelhausen listed her physical or mental conditions that limit her ability to work as "myalgia/myositis; degeneration of discs, arthritic; neck disk

disease; B12 deficiency; Vitamin D deficiency; myalgia/myositis; degeneration of cervical intervertebral disc; degeneration of lumbar/lumbosocral intervertebral disc." (Tr., at 70.)

Gelhausen's application was denied initially and upon reconsideration. (Tr., at 14, 69-77, 78-94.) On July 28, 2011, Gelhausen filed a written request for a hearing before an administrative law judge. (Tr., at 14, 105-106.)

An Administrative Law Judge ("the ALJ") convened a hearing on May 14, 2012, to hear Gelhausen's case. (Tr., at 35-68.) Gelhausen was represented by counsel at the hearing. (Tr., at 37.) Nancy J. Borgeson, Ph.D., a vocational expert, attended the hearing and provided testimony. (Tr., at 37, 63-67.)

On June 12, 2012, the ALJ issued her decision applying the standard five-step sequential analysis[1] to determine whether Gelhausen was disabled. (Tr., at 11-

---

[1] Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. Id. § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. Id. § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled. Id. § 404.1520(a)(4)(iv). Fifth, the ALJ determines whether, based on the

23.)  Based on her review, the ALJ concluded Gelhausen was not disabled.  (Tr., at 14, 23.)

The Appeals Council denied Gelhausen's request for review, thus rendering the ALJ's decision the final decision of the Commissioner.  (Tr., at 1-3.)  Gelhausen now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Gelhausen briefs two issues for review:

1.  Whether the ALJ erred in her evaluation of the opinion of Plaintiff's treating physician.

2.  Whether the ALJ erred by neglecting a significant impairment and whether the decision is supported by substantial evidence.

(Doc. 17, at 10.)

## II.  PERSONAL BACKGROUND INFORMATION

Gelhausen was born on October 12, 1971, and was 33 years old as of her application date.  (Doc. 14, tr., at 151, 173.)  Accordingly, Gelhausen was at all times considered a "younger person" for Social Security purposes.  See 20 C.F.R. §§

---

claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled. Id. § 404.1520(a)(4)(v).

The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997).

*Wilson  v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004).

3

404.1563(c), 416.963(c).  Gelhausen graduated from high school, and is able to communicate in English.  (Tr., at 46.)  She has past relevant work as a warehouse worker, laborer in chemical processing, cashier, and fast-food worker.  (Tr., at 63.)

### III.  MEDICAL EVIDENCE[2]

Disputed issues will be discussed as they arise in Gelhausen's brief alleging errors by the ALJ.  A short summary of relevant medical history follows here.  As noted earlier, Gelhausen applied for Disability Insurance benefits on August 13, 2010.  (Doc. 14, tr., at 14, 168-169.)  Gelhausen had listed the conditions that limit her ability to work as myalgia/myositis, arthritic disc degeneration; neck disk disease; vitamin deficiencies; degeneration of cervical intervertebral disc; and, degeneration of lumbar/lumbosocral intervertebral disc.  (Tr., at 70.)

Gelhausen reported to an emergency room on July 13, 2009, with back pain caused by a muscle spasm.  (Doc. 14, tr., at 296, 334-335.)  An MRI of the cervical spine was conducted on July 20, 2009, which revealed "mild cervical spondylosis at the C5/6 level."  (Tr., at 319.)  An MRI of the lumbar spine that same day showed right paracentral disc herniation at the T12/L1 level, left paracentral disc herniation at the L5/S1 level, and multilevel spondylosis.  (Tr., at 317-318.)

---

[2] The following is merely a summary of the medical evidence relevant to the undersigned's decision.  It is not intended to fully reflect all of the evidence the undersigned took into consideration.  Given the contested issues in this case, the focus is on evidence involving the treating physician, Dr. Moritz.

On August 12, 2009, Gelhausen had arthroscopic surgery on her right shoulder for a rotator cuff tear which had been causing fairly constant should pain. (Tr., at 287-289.)  Later that month, on August 28, Gelhausen underwent an epidural steroid injection for pain related to a lumbar herniated disc and lumbar radiculopathy.  (Tr., at 339.)  Several weeks later, on September 18, 2009, she received injections for lumbar postlaminectomy pain syndrome.  (Tr., at 346.)

On January 21, 2010, Gelhausen complained of back pain at an examination by Brad Moritz, M.D.  (Doc. 14, tr., at 444-445.)  She reported constant low back pain, with no radiation, as well as neck pain across her shoulders.  Id. at 444.  Dr. Moritz diagnosed "unspecified backache, unspecified myalgia and myositis, degeneration of cervical intervertebral disc, and, degeneration of lumbar or lumbosacral intervertebral disc."  At that time, Dr. Moritz prescribed Medrol Dosepak, and Gabapentin on a trial basis.  Id. at 445.

Gelhausen returned to Dr. Moritz several days later, on January 25, to complain of shortness of breath and nausea after she began taking the medications prescribed.  She also reported that they were not helping the pain, and she was having trouble sleeping.  Dr. Moritz cut the dose on the Gabapentin, eliminated the Medrol Dosepak, and added Amitriptyline.  (Tr., at 441-442.)

Gelhausen received Vitamin B-12 injections from Dr. Moritz, beginning on January 29, 2010, and continuing.  See, e.g., tr., at 436-437, 406, 412.

Gelhausen again returned to Dr. Moritz on February 5, 2010, reporting back pain and tingling.  She was fatigued, and nausea had recurred.  (Tr., at 433.)  Dr.

Moritz adjusted her medications, and added Meloxicam.  (Tr., at 435.)  At a follow-up visit on March 9, Gelhausen reported that she had a lot of leg pain, and that after she takes her medications, "she feels like her heart is going to beat out of her chest."  (Tr., at 414.)  Dr. Moritz made further adjustments to her medications.  (Tr., at 416.)

Gelhausen's next follow-up visit to Dr. Moritz was on May 18, 2010, at which time she reported that she did not like the Cymbalta.  She reported cramping in her joints, and she twitches when she sleeps, plus feels "some electric shocks in her body."  (Tr., at 404.)  Dr. Moritz decreased the Cymbalta, but added low dose Soma for muscle relaxation.  He continued, and modified, the Vitamin D and B12 routine. Dr. Moritz also "discussed activity modification but routine exercise and the wt loss issues."  (Tr., at 406.)  [Several medical providers had characterized Gelhausen, at 5" 2" and approximately 250-260 pounds, as morbidly obese.  See, e.g., tr., at 636, 387, 444.]

As follow-up to a recent (June 27) emergency room visit, Gelhausen reported to Dr. Moritz on June 29, 2010.  ER personnel had told her she has gallstones and a swollen liver, and gave her Zofran, Pepcid, and Vicodin.  She reported a hot sensation in her shoulder blades, hand and leg cramping, numb fingers, but no associated neck pain.  Also, nausea, fatigue, and vertigo. (Tr., at 400.)  Dr. Moritz advised her to continue her current medication, but to stop the Vicodin, decrease Mobic, and increase Prilosec.  He advised her to follow up with a gall bladder

function x-ray first, and a neck work-up secondarily (for the migraines and finger numbness.) (Tr., at 403.)

Gelhausen's next encounter with Dr. Moritz was on August 30, 2010, at which she complained of back and shoulder pain.  She reported pain had been worse in recent days, and meds were not working.  She also reported migraines, and leg cramps.  She said Soma did not help at all, and that she experienced a racing heart and shortness of breath with Lyrica and Gabapentin.  (Tr., at 385.)  The doctor made a slight adjustment in her medication, and ordered an MRI (thoracic spine) for her lower back.  (Tr., at 388.)

On September 8, 2010, Gelhausen had an MRI of the thoracic spine, which showed mild degenerative changes, with central disc herniation at T6-7, and several small bulging discs and osteophytes noted throughout the thoracic spine.  (Tr., at 302.)  Later that month, on September 28, Gelhausen had a bone scan, which showed "possible minimal postoperative changes in the lumbosacral spine," and "minimal degenerative changes in the lower extremities."  (Tr., at 300-301.)

Gelhausen reported to the emergency department on November 21, 2010, complaining of pain in the upper left arm and shoulder.  (Tr., at 449-450.)  A radiological report showed superficial thrombus and partial noncompressible deep vein thrombosis of the left upper arm.  (Tr., at 458.)

Dr. Moritz submitted an opinion on Gelhausen on August 12, 2010.  (Doc. 14, tr., at 280-281.)  He listed her physical and mental conditions as backache; mylagia/myositis, with radicular pain from back; neck disc disease; and Vitamin

B12 and D deficiencies.  He characterized her health status as poor but stable.  (Tr., at 280.)  Dr. Moritz said Gelhausen could stand or walk less than two hours of an eight-hour workday, less than one hour without interruption.  She could sit for probably three to four hours in a workday, one to two hours without interruption.  She could lift or carry up to five pounds frequently, and six to ten pounds occasionally.  She was extremely limited in pushing, pulling, or bending.  She is moderately limited in reach, and not significantly limited in repetitive foot movements.  (Tr., at 281.)

Gelhausen had an consultative physical exam with Mary Helene Massullo, D.O., on December 7, 2010.  (Tr., at 633-641.)  Gelhausen had limited range of motion of the left hip and limited straight leg raising on the left side.  She had diminished strength in the upper left arm, but strength was otherwise normal.  She also had normal sensation and reflexes.  Her gait was normal.  She reported fibromyalgia ("per patient").  Dr. Massullo concluded:

> The  patient appears to be compromised to any extremely strenuous physical activity at this point in time.  Fibromyalgia has waxing and waning.  If there is a flare up this may compromised [sic] all work related activities, however, work from a seated position . . . appears to be possible.

(Tr., at 636.)

Upon referral from Dr. Massullo, a lumbar spine x-ray done on December 7, 2010, showed spondylosis of the lower lumbar region and lower thoracic region, with bony narrowing of the L4-L5 and L5-S1 neural foramina.  A wedge fracture at L1, of unknown age, was also seen.  (Tr., at 643.)

## IV.  TESTIMONY OF VOCATIONAL EXPERT

At the hearing, the vocational expert Borgeson provided testimony.  (Doc. 14, tr., at 37, 63-67.)  Borgeson testified that Gelhausen had past relevant work as a warehouse worker, a laborer for the water company, a cashier/store keeper, and a fast food worker.  (Tr., at 63.)

The ALJ posed a hypothetical question concerning an individual with Gelhausen's same age, education, and work history, who can engage in light exertion; who can occasionally climb ramps and stairs, but never climb any  ladders, ropes, or scaffolds; and who can occasionally kneel, crouch and crawl.  The hypothetical person would have no limits on balancing and stooping; would be limited to occasional overhead reaching with the left arm.  The person must avoid moderate exposure to hazards and unprotected heights.  (Tr., at 63-64.)

"As for mental, can't understand, remember, and carry out instructions consistent with engaging with SVP: 1 and SVP: 2 level work."  (Tr., at 64.)  The hypothetical individual can maintain concentration, persistence and pace for two-hour blocks of time over a normal eight-hour day and work a 40-hour workweek. The hypothetical person can engage with the general public and coworkers up to an occasional basis, but is limited to superficial type interactions and conversations, and can work in a static type environment with routine minor changes.  (Tr., at 64.)

In response to the ALJ's question, the VE testified that this hypothetical individual could not perform any work that's consistent with the claimant's past relevant work.  (Doc. 14, tr., at 64.)  Borgeson testified that the jobs that Gelhausen

performed at the light level would have involved more than occasional public contact, as well as with coworkers, so she could not perform her past work. However, the VE testified that there would be other jobs at the light unskilled level that such a person could perform. Id.

Borgeson testified that such a person could be a cleaner, housekeeping, which is classified as light, unskilled at SVP: 2 level, DOT number 323.687-014. There are about 2,500 jobs in northeast Ohio, over 12,000 in the state, and about 1,000,000 nationally. Another job possibility is folder in a laundry or dry cleaner, which is also light, unskilled at SVP: 2 level, DOT number 583.685-042. There are about 3,000 jobs in northeast Ohio, 20,000 in the state, and approximately 394,000 nationally. A third job would be bench assembler, which is light, unskilled at SVP: 2 level, DOT number 706.684-022. There are about 5,000 such jobs in northeast Ohio, over 35,000 in the state, and approximately 289,000 nationally. (Doc. 14, tr., at 65.)

The ALJ then modified the hypothetical, limiting the person's standing and walking to four hours maximum in an eight-hour day. (Tr., at 65.) The VE responded that the jobs named (above) were light jobs, where ordinarily one would have to stand more than four hours in an eight-hour day, even with occasionally sitting permitted. The VE testified that the new hypothetical would be for sedentary work. (Tr., at 65-66.)

The ALJ differed, and stated that there were still light jobs existing that allowed for occasional standing, less than six hours, and asked the VE to identify a

job that allows for occasional standing.  Borgeson responded that there were "not too many," but one job would be mail clerk, non-post office, DOT number 209.687-026.  There are about 1,400 jobs in northeast Ohio, over 7,000 in the state, and about 139,000 nationally.  The VE eliminated the job of cashier II, because of the public contact.  The bench assembler could be done sitting or standing, still performing the work, "but I don't think there would be too many others what would exist in any great numbers at the light level." (Tr., at 66.)

At this point, the ALJ stated that "fewer than 200 jobs can satisfy the significant numbers requirement to meet step five requirements . . . And it would appear that as little as 100 jobs are sufficient to meet the statutory threshold." (Doc. 14, tr., at 66-67.)  Having established that, the ALJ determined that the jobs of mail clerk (nationally, 139,000), and bench assembler (139,000 in the U.S.), "more than adequately address the hypothetical number two."  (Tr., at 66.)

Claimant's counsel asked the VE if the person was limited to less than two hours of standing and walking in an eight-hour day, less than one hour without interruption, and only able to sit three or four hours and one or two hours without interruption, would there be jobs that claimant could perform in the national economy.  The VE responded, not full-time.  Counsel then asked if person was off-task 15 percent or more of the time, would she be able to do any of the jobs mentioned.  The VE said that it was her opinion that such a person would be unable to sustain those jobs, even though she may be able to perform the work task at times.  (Tr., at 67.)

11

## V.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in her

June 20, 2012, decision:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2.  The claimant has not engaged in substantial gainful activity since April 10, 2008, the alleged onset date (20 CFR 404.1571 et seq.).

3.  The claimant has the following severe impairments:  degenerative disc disease of the cervical and lumbar spines, major depressive disorder, and anxiety disorder NOS (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform light work with occasional climbing of ramps and stairs, never climbing ladders, ropes or scaffolds, occasional kneeling, crouching and crawling, unlimited balancing and stooping, occasional overhead reaching with the left arm, must avoid moderate exposure to hazards and unprotected heights, the claimant can understand, remember and carry out instructions consistent with engaging in SVP 1 and SVP 2 level work, can maintain concentration, persistence and pace for two hour blocks of time over a normal eight hour day and 40 hour week, can engage in occasional contact with the general public and co-workers with superficial type interactions and conversations, can work in a static type environment with routine minor changes.  20 CFR 404.1567(b).

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on September 23, 1972, and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 10, 2008, through the date of this decision (20 CFR 404.1520(g)).

(Doc. 14, tr., at 16-18, 21-23.)

## VI.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act.  See 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  See 20 C.F.R. §§ 404.1505, 416.905.

## VII.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence.  Blakley v. Comm'r of Social Security, 581 F.3d 399, 405 (6th Cir. 2009); Richardson v. Perales, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  See Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, that determination must be affirmed.  Id.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion.  See Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986); Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).  This court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  See Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).  However, the court may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  See Walker v. Sec'y of Health & Human Servs., 884 F.2d 241, 245 (6th Cir. 1989).

### VIII.  ANALYSIS

Gelhausen briefs two issues for review:

1.  Whether the ALJ erred in her evaluation of the opinion of Plaintiff's treating physician.

2.  Whether the ALJ erred by neglecting a significant impairment and whether the decision is supported by substantial evidence.

(Doc. 17, at 10.)

### A.  Treating Physician

Gelhausen argues that the ALJ improperly gave "little weight" to the opinion of her treating physician, Dr. Moritz, on the basis that "this opinion is not supported by the objective evidence in the record which establishes that the claimant can perform a range of light work."  (Doc. 17, at 10-11, quoting tr., at 20.) Gelhausen submits that the ALJ's evaluation is "completely incapable of fulfilling the requirements of the treating physician rule," thus requiring remand.  (Doc. 17, at 11.)

Gelhausen contends that, contrary to the ALJ's finding, the evidence readily supports Dr. Moritz's opinion.  (Doc. 17, at 12.)  She points out that Dr. Moritz had overseen her treatment, documenting in his notes symptoms "entirely consistent" with her subjective complaints.  Id.  She argues that Dr. Moritz's opinion "was based on his intimate knowledge of the severity of Gelhausen's conditions, which he obtained through his own repeat examinations as well as through his review of her troubling history of emergency treatment."  (Doc. 17, at 13.)  Gelhausen states that

15

the ALJ failed to point to any contradictory evidence in the record which would support rejection of the treating physician's opinion.  (Doc. 17, at 14.)

Gelhausen claims that the ALJ was required to follow a two-step analysis involving the weight given to a treating physician, and failed to do so.  (Doc. 17, at 14-15, citing Gayheart v. Commissioner, 710 F.3d 365, 375-376 (6th Cir. 2013), and Kirven v. Colvin, No. 5:12CV1727, 2013 WL 3766590, at *5 (N.D. Ohio July 16, 2013).)  First, the ALJ should make a determination on the issue of controlling weight, and then separately, apply the factors that determine what weight is appropriate.  Id. at 14.  Gelhausen contends that the ALJ simply made a conclusory determination that the treating physician's opinion was to be afforded "little weight."  Id. at 15.

It is well-recognized that an ALJ must generally give greater deference to the opinions of a claimant's treating physicians than to non-treating physicians. Gayheart, 710 F.3d at 375; Blakley, 581 F.3d at 406; Wilson, 378 F.3d at 544.  This doctrine, often referred to as the "treating physician rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history.  Id.; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The treating physician doctrine requires opinions from treating physicians to be given controlling weight where the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case

16

record." Gayheart, 710 F.3d at 376 (citing  20 C.F.R. § 404.1527(c)(2)); Blakley, 581 F.3d at 406; Wilson, 378 F.3d at 544.  In other words, treating physicians' opinions are only given deference when supported by objective medical evidence.  Vance, 2008 WL 162942, at *3 (citing Jones v. Commissioner, 336 F.3d 469, 477 (6th Cir. 2003)).

Even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations.  Gayheart, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(1) -(6), 416.927(c)(1)-(6).  Social Security regulations require the ALJ to give good reasons for discounting evidence of disability submitted by the treating physician(s).  Blakley, 581 F.3d at 406; Vance v. Commissioner of Social Security, No. 07-5793, 2008 WL 162942, at *3 (6th Cir. Jan. 15, 2008).  Those good reasons must be supported by evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight assigned to the treating physician's opinion, and the reasons for that weight. Gayheart, 710 F.3d at 376; Blakley, 581 F.3d at 406-407; Winning v. Commissioner, 661 F.Supp.2d 807, 818-819 (N.D. Ohio 2009) (quoting SSR 96-2p).

Remand may be appropriate when an ALJ fails to provide adequate reasons explaining the weight he assigned to the treating source's opinions, even though "substantial evidence otherwise supports the decision of the Commissioner." Kalmbach v. Comm'r of Soc. Sec., No. 09-2076, 2011 WL 63602, at *8 (6th Cir. Jan. 7, 2011) (quoting Wilson, 378 F.3d at 543-46).

17

The Commissioner responds that the ALJ analyzed the totality of the record, and properly afforded Dr. Moritz's opinion little weight based on its inconsistency with the objective medical evidence.  (Doc. 18, at 15.)  The Commissioner points out that it is the ALJ's role to make the final RFC and disability determinations, and that a treating source opinion is afforded controlling weight only where it is well-supported by the medical evidence, and not inconsistent with other substantial evidence in the record.  (Doc. 18, at 15, citing 20 C.F.R. § 404.1527(c)(2), and Cutlip v. Secretary, HHS, 25 F.3d 284, 287 (6th Cir. 1994).)

The Commissioner states that even a "brief" statement identifying the factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion.  (Doc. 18, at 16, citing Allen v. Commissioner, 561 F.3d 646, 651 (6th Cir. 2009).)  In Allen, the relevant portion of the opinion reads as follows:

> The ALJ provided a good reason for discounting Dr. McCord's response to Allen's first question regarding the persistence of Allen's condition:
>
>> Dr. McCord merely affirmed that it might be reasonable to conclude the claimant's symptoms had remained unchanged since December of 2003, an opinion the undersigned found to be speculative since Dr. McCord had not seen the claimant for the first time until some two years later, on December 8, 2005.
>
> While this stated reason may be brief, it reaches several of the factors that an ALJ must consider when determining what weight to give a non-controlling opinion by a treating source, including: the length of the treatment relationship and the frequency of examination, 20 C.F.R. § 404.1527(d)(2)(i); the nature and extent of the treatment relationship, § 404.1527(d)(2)(ii); and the supportability of the opinion, § 404.1527(d)(3).

Allen, 561 F.3d at 651.  At this point, it is worth quoting the relevant portion of the

ALJ's opinion in the case at hand:

> Little weight is given to the opinion of Brad Moritz, M.D., who
> completed a basic medical report on August 12, 2010 [tr., at 280-281]
> and indicated that the claimant could lift 6-10 pounds occasionally,
> stand and walk for less than two hours in an eight hour work day and
> probably sit for 3-4 hours in an eight hour work day because this
> opinion is not supported by the objective evidence in the record which
> establishes that the claimant can perform a range of light work.

(Doc. 14, tr., at 20.)  While this excerpt is less "brief" than that quoted from Allen, it

is also much less specific.  The ALJ in Allen managed to address several of the

relevant factors in his concise statement; the ALJ here merely states that "this

opinion is not supported by the objective evidence in the record which establishes

that the claimant can perform a range of light work."  (Tr., at 20.)

Earlier in her decision, the ALJ referred to the opinion of Dr. Massullo (given

"considerable weight"), who performed the consultative physical exam on December

7, 2010, and determined that her findings were consistent with evidence in the

record establishing that Gelhausen can perform a range of light work.  (Tr., at 20.)

The ALJ also discussed the opinions of Dr. Pickholtz ("some weight"), who

performed a consultative psychological exam; Eve Smith, a mental health counselor

("little weight"); and Constance Ebong, M.D. ("little weight"), none of whom opined

on Gelhausen's physical capacities.  (Tr., at 20-21.)  The only medical (as opposed to

mental or psychological) opinions relied upon by the ALJ, then, were those of Dr.

Massullo and Dr. Moritz.  (Tr., at 20.)  In another case where the ALJ did not

identify the substantial evidence that was purportedly inconsistent with the

treating source's opinions, the Sixth Circuit noted:  "Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors."  Gayheart, 710 F.3d at 377.

The Commissioner points to evidence in the record supporting the assertion the Dr. Moritz's opinion was inconsistent with objective evidence in the record. (Doc. 18, at 16-17.)  Whatever the merits of that evidence, this reasoning is not to be found in the ALJ's decision.  "A fundamental rule of administrative law is that a reviewing court must judge the propriety of the action solely on the grounds invoked by the agency."  Roper v. Secretary, HHS, 769 F.Supp. 243, 247 (N.D. Ohio 1990) (citing SEC v. Chenery, 332 U.S. 194, 196 (1947)).  The court may not rely on counsel's ad hoc rationalizations.  May v. Astrue, No. 4:10CV1533, 2011 WL 3490186, at *9 (N.D. June 1, 2011); Roper, 769 F.Supp. at 247.  The decision must be evaluated on the basis articulated by the ALJ.  Roper, 769 F.Supp. at 247.

Given the deference which the opinion of a treating physician is ordinarily accorded, the Sixth Circuit has stated that the "good reasons" rule requires the ALJ to make "some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."  Friend v. Commissioner, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr. 28, 2010) (per curiam).  The court finds the ALJ's statement that Dr. Moritz's opinion that "is not supported by the objective evidence in the record which establishes that the claimant can perform a range of light work" is not "sufficiently specific" to meet the requirements of the treating source rule, as it neither identifies the specific

20

"objective evidence" at issue nor discusses the evidence's inconsistency with Dr. Moritz's opinion.  See, e.g., Friend, 2010 WL 1725066, at *8.

The court finds that the ALJ's RFC is not supported by substantial evidence in the record.  In addition, the court finds that remand is appropriate because the ALJ failed to provide adequate reasons explaining the weight she assigned to the treating physician source Dr. Moritz's opinions.

### B.  Rheumatological Impairment

Gelhausen also argues that she "plainly has a rheumatological impairment, which causes severe symptoms and limitations," and the ALJ erred by neglecting this significant impairment, thus the decision is not supported by substantial evidence.  (Doc. 17, at 15.)

Gelhausen notes that consulting physician Dr. Massullo wrote that a fibromyalgia flare-up could compromise all work-related activities (tr., at 636), and also there is reference to a past diagnosis (not in the record) of fibromyalgia in her history.  Gelhausen points out that "Dr. Moritz also treated Gelhausen for myalgia and recorded the presence of multiple trigger points, consistent with a fibromyalgia diagnosis." (Doc. 17, at 15, citing tr., at 444-445.)

Gelhausen complains that her "fibromyalgia appears literally nowhere in the ALJ's decision." (Doc. 17, at 16.)  The Commissioner responds that, at the time of the ALJ's decision, Gelhausen's alleged fibromyalgia was not a medically determinable impairment.  (Doc. 18, at 11.)  A medically determinable impairment

21

cannot be based solely on the basis of a claimant's allegations of symptoms; rather there must be evidence from an "acceptable medical source" to establish the existence of a medically determinable impairment that can reasonably be expected to produce the symptoms.  (Doc. 18, at 11, citing 20 C.F.R. §§ 404.1508, 404.1529, 404.1513(a); SSR 96-4p; SSR 96-7p; SSR 06-03p.)

The Commissioner points out that, subsequent to the ALJ's decision, Social Security Ruling 12-2p set forth guidelines under which an ALJ may find fibromyalgia to be a medically determinable impairment.  (Doc. 18, at 11, citing SSR 12-2p.)  According to that SSR, when a claimant seeks disability due to fibromyalgia, she must have a positive diagnosis from a medically acceptable source with documented evidence consistent with a diagnosis of fibromyalgia, including criteria set out by the American College of Rheumatology.  SSR 12-2p, §§I, II.A., III.A.  The physician's diagnosis, standing alone, is insufficient:  "The evidence must document that the physician reviewed the person's medical history and conducted a physical exam."  SSR 12-2p, §I; see also §II.A.2.

The Commissioner asserts that, although Gelhausen alleged that she suffered from fibromyalgia, she provides no evidence to establish this as a medically determinable impairment.  The Commissioner points out that, although Gelhausen self-reported having been diagnosed with fibromyalgia (see, e.g., tr., at 636, 803), there is no evidence of a positive diagnosis from a medically acceptable source.  The Commissioner states that her treating physician during 2010-2011, Dr. Moritz, did

not diagnose her with fibromyalgia.  (Doc. 18, at 12.)  In her reply brief, Gelhausen does not point to any evidence of such a diagnosis.  See generally doc. 19.

The Commissioner states that ALJ extensively reviewed the evidence of record and determined Gelhausen's RFC in accordance with the regulations.  (Doc. 18, at 12-13.)  The Commissioner argues that, because fibromyalgia was not established as a medically determinable impairment, there was no error in not including Gelhausen's subjective allegations in the later steps of the sequential evaluation.  (Doc. 18, at 12, citing 20 C.F.R. §§ 404.1508, 404.1529; SSR 96-4p; SSR 96-7p.)  The court agrees, and does not find that the ALJ's decision in this regard is in error.

SUMMARY

For the foregoing reasons, the court finds that the decision of the Commissioner is not supported by substantial evidence.  Specifically, the court finds that the ALJ's RFC is not supported by substantial evidence in the record.  In addition, the court finds that remand is appropriate because the ALJ failed to provide adequate reasons explaining the weight she assigned to the treating physician's opinion.  The record evidence as discussed in the ALJ's decision is not such that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination.  The decision of the ALJ is vacated and remanded to assess the medical opinions of record and, if necessary, provide an explanation for the weight assigned, in accordance with this opinion.


IT IS SO ORDERED.

Dated:   Mar. 16, 2015              /s/ Kenneth S. McHargh
                                    Kenneth S. McHargh
                                    United States Magistrate Judge